UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

FRANK NOBILETTI,

Plaintiff,                                    COMPLAINT

- against -

POLO BAR RALPH LAUREN & APICII LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Frank Nobiletti ("plaintiff" or "Nobiletti"), by his attorneys Vladeck, Raskin &

Clark, P.C., complains of defendants the Polo Bar Ralph Lauren (the "Polo Bar") and Apicii LLC

("Apicii") (collectively, "defendants" or the "restaurant") as follows:

NATURE OF CLAIMS

1.      The Polo Bar, which is well-known for its "buzzy" and "cozy" atmosphere,

is the very definition of New York exclusive.  For most, it is nearly impossible to get a reservation.

The restaurant caters to the most wealthy and famous with a long list of regular celebrity

customers, including Drew Barrymore, Oprah Winfrey, Jim Cramer, Jennifer Lopez, Connan

O'Brien, Nick Jonas, Tom Hanks, the Clintons, Jon Hamm, Aaron Sorkin, Jonathan Tisch, and

Alex Rodriguez, to name only a few.  While the restaurant and its hard-working staff do everything

they can to ensure that their guests have a first class experience, defendants completely failed to

guarantee that their employees had a safe and legal work environment.

2.      All of the external glitz and fame did not save defendants' employees from

a toxic culture that included widespread sexual harassment, sexual assault, and rampant drug use

and alcohol consumption at work.  Nobiletti, a man in his forties who is married to a woman and

who has over 20 years of experience in the hospitality industry, faced terrible sexual harassment during his almost seven years at the Polo Bar.  As set forth below, after a manager outed Nobiletti as bisexual, other managers and staff believed he was fair game for incessant sexual harassment and multiple assaults.

3.      When Nobiletti returned to the restaurant in 2021 after it reopened following the onset of the COVID pandemic, a colleague with whom Nobiletti had never discussed his sex life began joking about Nobiletti's sexuality. When the comments persisted and defendants failed to remedy the harassment, other Polo Bar employees believed they had carte blanche to perpetuate the hostile work environment.  The comments included saying in sum and substance that Nobiletti wants to watch men "fuck" his wife, because he wants to come up behind them and "fuck" them; asking Nobiletti whether everyone should "go together to the bathhouse"; and asking whether everyone "like[s] cock now."

4.      In addition to his coworkers and supervisors unleashing a barrage of repugnant comments and jokes about his sexuality, two managers sexually assaulted Nobiletti.  In 2022, Michael Lewis, the then-Private Dining and Events Manager at the Polo Bar, asked plaintiff to have drinks at a bar to discuss work matters; then discussed a promotion with plaintiff; then referred to plaintiff's sexuality; and then proceeded to touch plaintiff on his inner thigh, close to his penis.  In addition, in the fall 2023, Darnell Dodson ("Dodson"), the then-International Director of Hospitality, who has engaged in countless acts of inappropriate conduct over the years, after asking plaintiff if he was relieved to be out about his sexuality, hugged plaintiff and then grabbed his butt. Plaintiff nearly  lost his balance from the assault.

5.      Nobiletti made multiple complaints about the misconduct, including directly to Human Resources and through counsel, starting in the fall 2023 and continuing until

defendants unlawfully fired him.  On February 9, 2024, defendants fired plaintiff, purportedly for drinking at work even though, since the Polo Bar opened in 2015, management and staff regularly drank alcohol and used illegal drugs during work hours with little to no consequences for such actions.  It was only after Nobiletti complained about unlawful harassment that defendants supposedly took notice of his drinking.  Defendants' retaliation sent a clear message to plaintiff and other staff members that if they complain about unlawful behavior, defendants will punish them.

6.      Based on the conduct described in more detail below, Nobiletti brings this action to remedy unlawful sex discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. (the "City Law").

<u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff's Title VII claims arise under federal law.

8.      This Court also has supplemental jurisdiction over plaintiff's Executive Law and City Law claims pursuant to 28 U.S.C. § 1367 because these claims relate closely to the Title VII claims, having arisen from a common nucleus of operative facts, such that the Executive Law and City Law claims form part of the same case or controversy.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391 because defendants reside in New York, New York; plaintiff worked in New York, New York; and the majority of the events giving rise to the plaintiff's claims occurred in New York, New York.

10.     Pursuant to Section 8-502(c) of the City Law, plaintiff will serve a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

<u>PARTIES</u>

11.     Frank Nobiletti resides in New York City.  He worked at the Polo Bar in New York City from approximately February 2017 until February 9, 2024.

12.     The Polo Bar, which opened in 2015, is a high-end restaurant in Manhattan known for the difficulty of securing  a reservation and for attracting celebrity clientele, including politicians (e.g., Kevin McCarthy and the Clintons); actors and musicians (e.g., Jennifer Lopez, Jon Hamm, Leonardo DiCaprio, and Nick Jonas); famous sports figures (e.g., Alex Rodriguez and Jerry Jones); and successful executives (Jonathan Tisch, Chief Executive Officer of Lowes Hotels).

13.     Apicii LLC is a hospitality management company that manages several types of businesses, including hotels, office buildings, and restaurants.  It took over management of the Polo Bar in or around February 2020. On information and belief, Apicii is largely responsible for day-to-day management of the Polo Bar and its employees, including maintaining employment records and overseeing payroll activities.

<u>FACTUAL ALLEGATIONS</u>

<u>Polo Bar's Pervasive Culture of Drinking, Drug Use, and Sexual Harassment</u>

14.     For years, defendants have permitted a workplace where drinking, drug use, and sexual harassment were commonplace.

A.     <u>Dodson Sexually Assaults and Harasses Male Employees</u>

15.     Dodson began working at Polo Bar when it opened in 2015.  During this time, despite repeated instances of sexual misconduct and defendants' knowledge of the harassment, defendants have rewarded Dodson by promoting him on multiple occasions.

16.    When defendants hired Nobiletti at Polo Bar, Dodson was the Beverage Director.  In or around 2018, Dodson was promoted to General Manager.  In or around 2021, defendants promoted Dodson yet again to International Director of Hospitality.

17.    Upon information and belief, Dodson, who is gay, sexually harassed and assaulted male Polo Bar employees starting in 2015, before Nobiletti joined the restaurant. Throughout Nobiletti's employment, Dodson regularly sexually harassed male employees. Dodson's misconduct was widely known throughout the restaurant, openly discussed by staff, and reported to Human Resources on more than one occasion.

18.    Dodson sexually assaulted male employees multiple times.

19.    Upon information and belief, in 2015, Dodson sexually assaulted a server by grabbing his penis.  The server complained about the incident to management.

20.    In response to Dodson's sexual assault, on information and belief, defendants suspended Dodson for a week.  The stated reason for Dodson's suspension was unrelated to the alleged sexual assault.

21.    Upon information and belief, Dodson assaulted another Polo Bar employee, in 2015 or 2016. Dodson and a server ("J.T.") were at a bar off-premises.  On information and belief, when J.T. went to the restroom, Dodson followed him inside and forcibly kissed and touched J.T. without his consent.

22.    In addition, during dinner shifts, Dodson frequently touched male servers without their consent; he used the pretense that he was doing so was to adjust or fix their ties, which were part of the required uniform.  He also frequently gave male employees unrequested back massages without consent or warning.  Dodson targeted several male employees with this

type of behavior, including Nobiletti and, on numerous occasions, "T.C."; "M.K."; "S.L."; and "L.P."

23.    Dodson often touched T.C. in the kitchen and dining room under the pretense of fixing his tie. Eventually, T.C. complained to Kieran Sweeney ("Sweeney"), currently General Manager of the Polo Bar. T.C. asked Sweeney to make Dodson stop touching him and said if Dodson did not stop, T.C. would quit. Upon information and belief, Dodson faced no repercussions for his actions.

24.    Dodson continued to touch T.C. without his consent despite his protests, and T.C. quit his job at Polo Bar in late 2023.

25.    In addition, Dodson often made hiring decisions based on physical appearance.  During plaintiff's employment, on multiple occasions, Dodson hired young men because he found them attractive.  He hired them for roles as bartenders or barbacks (who assist bartenders and make sure that they always have everything they need, including glasses, garnishes, stocked bottles, fresh kegs) even though they did not have the typical level of experience required to professionally perform the jobs.

26.    On information and belief, Dodson hired those young men hoping to have a sexual relationship with them.  On information and belief, Dodson targeted them for sex after they began working for defendants.  Dodson made clear to those male employees who had a sexual relationship with him that they would receive preferential treatment and, in many instances, plaintiff learned that they did.  In contrast, on at least one occasion, when an employee rejected Dodson's advances, Dodson punished him.

27.    On information and belief, in one such instance, Dodson hired a barback, "K.W.", even though he had no experience as a barback or a bartender.  After Dodson hired K.W.,

on information and belief, K.W. regularly spent the night at Dodson's home. Months after he was hired, Dodson promoted K.W. to bartender despite his lack of experience.

28.    Upon information and belief, Dodson's employment with Defendants ended in August 2024.

B.    <u>Other Sexual Harassment</u>

29.    Other restaurant employees engaged in sexual harassment, including against women. Indeed, multiple woman servers called the restaurant a "boys' club."

30.    For example, Carlos Lopez ("Lopez"), a long-time server at the Polo Bar, has developed something called the "Rating Game." As part of the Rating Game, women customers are rated based on attractiveness. The male servers frequently made offensive and graphic sexual comments about the women customers.

31.    On information and belief, multiple female staff members complained about the Rating Game as being sexist and inappropriate. Not only did defendants ignore their concerns, but some of the managers participated in the misconduct.

32.    Lopez regularly showed plaintiff and, on information and belief, other Polo Bar servers and at least one manager, nude photos of women he was dating.

33.    On one occasion, Lopez showed several Polo Bar staff nude photos of one of their colleagues, a hostess Lopez was dating at the time. On information and belief, a Polo Bar employee reported this behavior to the Maître d'. In turn, on information and belief, the Maître d' then reported this to the Head Maître d', but the restaurant did not discipline Lopez.

34.    Also, on information and belief, multiple male servers regularly joked about "putting it in," which was a sexual reference to female server "K.B."

35.     Also, in or around the spring 2023, Nathan Wooden ("Wooden"), then the restaurant's Beverage Director, made a vulgar comment about raping server "O.S."  In response to a question about who he would take to a deserted island, Wooden said, on information and belief, that he would bring Lopez and O.S. so that when he was not "fucking" O.S., he could watch Lopez "fuck" O.S.  On information and belief, Human Resources was made aware of the comment, but took no disciplinary action against Wooden.

36.     On information and belief, at least one female employee made multiple complaints against Stefan Coman ("Coman"), a server, for his sexual harassment and treatment of another female employee.  Even though defendants eventually fired Coman, on information and belief, they did so for reasons having nothing to do with sexual harassment complaints.

37.     On information and belief, a former restaurant employee, "F.K.," complained to Human Resources about the gender bias and other misconduct by male managers, including managers Sean Fitzgerald ("Fitzgerald") and Wooden.  F.K. reported that Fitzgerald regularly yelled at employees during service, threatened staff with firing them, and falsely accused employees of misconduct.  F.K. further complained that Wooden was aggressive and was frequently condescending towards female managers in front of other staff.  To plaintiff's knowledge, defendants took no remedial action against Fitzgerald or Wooden based on F.K.'s complaint.

C.     <u>Drinking and Drug Use by Polo Bar Managers and Employees</u>

38.     Since Nobiletti began working at Polo Bar, employees, including servers, bartenders, and sommeliers, regularly drank alcohol and engaged in drug use at work during their shifts.  Managers were not only aware of the drinking and drug use but often participated in it. Defendants took no, or virtually no, disciplinary action against staff for drinking or using drugs

during their shift, including staff who were intoxicated or high while working and who engaged in other inappropriate conduct.

39.    By way of example only:

- Upon information and belief, in 2015, a manager slapped a server in the restaurant's dining room while intoxicated. Defendants did not discipline that manager and later promoted her to Service Director.

- In 2022, Coman, a server, routinely drank to the point of intoxication during his shifts. On one occasion, Coman became so drunk that he could not complete his shift. The next day, two managers told Coman, in sum and substance, that his drinking had become excessive and that they had no choice but to write him up for the infraction. One manager then told Coman that any further discipline was up to "[the manager's] discretion" and assured him the written warning would "go nowhere." During that same conversation, when Coman mentioned feeling stressed, the same manager told him that "[they] are going to do what [Coman] need[ed]" and that "[the managers are] here to do whatever [they] can to help [Coman]." Coman was so upset that he left in the middle of his shift. Nobiletti was forced to cover Coman's section for the remainder of his shift. Ultimately, Coman returned to work the following day and was not disciplined for drinking or for leaving his shift early.

- During Nobiletti's tenure, managers Fitzgerald and Wooden regularly drank during their shifts. By the end of the dinner service, they were often intoxicated. While drunk they frequently yelled and engaged in other belligerent conduct towards less senior staff members. For example, after Nobiletti had spilled ketchup on himself, Fitzgerald, who was intoxicated at the time, joked "looks like Frank got his period." Nobiletti pushed back on the embarrassing conduct. On another occasion, Wooden mocked Nobiletti and Fitzgerald laughed. Nobiletti asked Fitzgerald why he was laughing, and Fitzgerald responded "Because I think it's fucking funny." Fitzgerald later followed Nobiletti into a hallway. There, he said to Nobiletti that he was plaintiff's boss and told plaintiff never to "fucking talk to [him] like that again" and that if he did so, Nobiletti would "regret it."

- In a separate incident, Fitzgerald, after consuming alcohol, threatened a bartender, including repeatedly punching the door to the manager's office while screaming at the bartender.

- Upon information and belief, Dodson occasionally snorted cocaine with other Polo Bar employees in the restaurant's wine room.

- Polo Bar staff, including Lopez, regularly mixed cocaine with water in a spray bottle and used that bottle to ingest cocaine during service.

- Plaintiff has since learned, on information and belief, that Lopez began dealing cocaine as early as 2015, including at work, which he shared with some of the staff. Some managers were aware that Lopez sold drugs while working.

- On information and belief, multiple other Polo Bar staff members, including at least one manager, regularly sold or gave restaurant employees illegal drugs in the restaurant during their shifts.

40.     In addition to the above, during plaintiff's employment, Polo Bar employees often consumed alcohol paid for by patrons, including customers who reserved the Private Dining Room ("PDR"), an area of the restaurant that was available for customers to book for large parties or special events; customers who hosted events in the Main Dining Room ("MDR"); and customers who "bought out" the entire restaurant, i.e., when a guest chooses to rent out the entire restaurant. In multiple ways and with management's knowledge and approval, the employees consumed alcohol unbeknownst to the customers who had paid for it.

41.     For example, throughout Nobiletti's employment, it was commonplace for Polo Bar employees to charge customers for drinks that the employees consumed themselves or unopened bottles of alcohol that they took home. Any party that booked the Private Dining Room or customer who rented the entire the restaurant was subject to a "minimum spend," i.e., a guaranteed minimum amount of spending on food and beverages.  This arrangement facilitated employees' drinking at the customers' expense.

42.     After the restaurant raised the minimum spend for a party renting the PDR to $7,000, parties rarely ordered enough food and drink to reach the minimum. As a result, after completing dinner service, Defendants then increased the bill to the $7,000 minimum. Ultimately, the employees understood that the practice of employees' charging drinks they consumed themselves to guests in the PDR did not affect the final amount the restaurant charged the customers; because those guests failed to satisfy the guaranteed minimum, they paid a set amount whether the employees charged drinks to the event.  Moreover, customers rarely checked their bills or asked questions.

43.     Also, patrons that reserved the PDR pre-selected three wine options. The Polo Bar opened one or two bottles of each selection as soon as the party arrived. Throughout service, open bottles of wine remained in an employees-only area and servers brought them out regularly to serve the guests. Polo Bar managers and employees frequently helped themselves to glasses of wine from the open bottles paid for by PDR patrons.

<u>Nobiletti's Employment with Polo Bar</u>

44.     Nobiletti is an experienced hospitality professional who has worked in restaurants for more than 20 years.

45.     In early 2017, Nobiletti was hired to work as a server at the Polo Bar.  In his nearly seven-year tenure, Nobiletti mainly worked as a server.  For a time, Nobiletti also worked as bartender.  Even though it was uncommon for an employee to work effectively as both a bartender and a server, Nobiletti spent over a year successfully doing both, including working as a bartender when the restaurant was short on bar staff.

46.     As a server, Nobiletti was responsible for conveying orders from restaurant customers to the kitchen and serving food and drinks to those customers.

47.     Nobiletti often worked in the PDR, which, as set forth above, is an area of the restaurant that customers could book for large parties or special events.

48.     Nobiletti consistently received positive performance feedback and was frequently scheduled to work in the PDR which demonstrated the trust his managers had in his performance. Until his firing, Nobiletti was not suspended nor warned that his job was in jeopardy.

49.     In early 2022, Ralph Lauren opened Ralph's Coffee near the flagship Ralph Lauren Men's store on Madison Avenue. Polo Bar managers asked Nobiletti and three other servers to observe service at the new coffee shop and help the management team there improve the flow

and organization of service. Nobiletti did so, and days after his recommendations to the new coffee

shop, Lewis spoke to Nobiletti about potentially becoming the new Assistant Events Manager.

<u>Defendants Force Plaintiff to Endure Sexual Harassment for Years</u>

50.     After Dodson, then a manager, learned that Nobiletti is bisexual, he was

outed and subject to constant sexual harassment, including multiple sexual assaults and ridicule.

51.     In late 2019, Nobiletti began to experience severe pain in his pelvic region.

Before his doctor was able to provide a diagnosis, he suggested several potential causes.  Among

other ideas, Nobiletti's doctor hypothesized that Nobiletti may have contracted a sexually

transmitted infection ("STI") during a sexual encounter he had recently had with men at a Turkish

bathhouse, and that infection was the cause of his pain.

52.     On one occasion when Nobiletti experienced severe pain at work, Dodson

noticed Nobiletti react to the pain and pulled him aside to check on him.  Nobiletti told Dodson

about the pain he had been experiencing. Because Dodson was also a member of the LGBTQ

community, Nobiletti, seeking reassurance that he likely did not have an STI, told him about the

bathhouse encounter and his doctor's theory. Dodson responded that he believed it was unlikely

Nobiletti had an STI.

53.     The Polo Bar closed its dining spaces in early 2020 due to COVID-19.

Nobiletti returned to work in late 2021 after the Private Dining Room had reopened.  Shortly after

Nobiletti returned, after the restaurant's COVID closure, it became apparent that Dodson had outed

plaintiff to other employees.

54.     Beginning in or around early 2022, several of Nobiletti's colleagues began

harassing Nobiletti, talking openly about his sexuality and the Turkish bathhouse.  For example,

Lopez made a joke referencing the bathhouse in front of Nobiletti and many members of the front

of house staff (who are the employees responsible for interacting directly with customers,

including servers, hosts, and bartenders).  Nobiletti repeatedly made clear the comments were unwelcome.

55.    Wooden, who was in early 2021 a sommelier and later the Beverage Director of Polo Bar, was most frequently responsible for the harassment, including making the offensive comments himself in front of other staff and encouraging others to do so.  Such typical comments that  Wooden made openly to Nobiletti included: "Frank, should we all go together to the bathhouse?" and "Do we all like cock now?"

56.    Because Wooden acted with impunity, other staff members believed they had permission to make offensive comments about plaintiff's sexuality.  For example, a sommelier who reported to Wooden, Artem Raetckii, asked Nobiletti in 2023, "Hey, you like dudes; would you give [a customer] a blow job?"

57.    Wooden continued to make sexually harassing comments and encourage others to do so for years, but Nobiletti did his best to ignore the comments.  Nobiletti believed that if he engaged or responded to the harassment, he would encourage the misconduct.   By September 2023, however, Nobiletti could no longer withstand the barrage of harassing and inappropriate conduct.

58.    On or about September 8, 2023, the restaurant, which had been bought out, was reserved for a group of individuals participating in the Ralph Lauren fashion show. Nobiletti, Wooden, and several others were preparing for that evening's service in the kitchen when Wooden pulled another colleague, Felix Diaz ("Diaz"), aside. Diaz, then, in front of several other employees, said, "Hey Frank, tell us all what happened at the bathhouse."  Nobiletti, despite being humiliated and angry, was able to complete that evening's service without further incident.

59.    The following day, Diaz, who had made the embarrassing comment, confirmed to plaintiff that Wooden had told him to do so. After plaintiff confronted Wooden, Wooden eventually admitted he did so in an attempt to get Nobiletti "revved up."

60.    Around this same time, Nobiletti learned that Wooden frequently made a repugnant joke about plaintiff and his wife.   Wooden purportedly said, "Frank is bisexual and wants to watch everyone fuck his wife, because he wants to come up behind them and fuck them."

61.    For years, Wooden continued making sexually harassing comments about plaintiff. On several occasions, Wooden made such comments in front of Polo Bar managers. A Polo Bar employee told plaintiff that everyone makes inappropriate jokes at the Polo Bar because the staff drinks so frequently.

<u>Dodson Sexually Assaults Nobiletti After He Reports the Harassment</u>

62.    On or about September 9, 2023, Dodson sexually assaulted Nobiletti in front of a building located at 65 West 55th Street.

63.    While they stood outside the building, Nobiletti described to Dodson the comment made during the previous night's dinner service and Wooden's involvement in it.   He expressed, in sum and substance, that the comment upset him in part because it revealed his sexuality to several Polo Bar employees who previously did not know he is bisexual.

64.    Dodson replied that Wooden's conduct was "highly inappropriate." Dodson then said, "Aren't you glad you can be out about your sexuality now?" and hugged Nobiletti.  After Nobiletti turned around, Dodson tapped Nobiletti's buttocks and then grabbed it. Dodson's grab was forceful enough that Nobiletti nearly lost his balance.  Dodson's touching of Nobiletti was unwanted, unwarranted, and without consent.

<u>Another Manager Sexually Assaults Nobiletti</u>

65.    On or about March 14, 2022, Michael Lewis ("Lewis"), the Polo Bar's Private Dining and Events Manager, sexually assaulted Nobiletti at Quality Bistro, a restaurant located at 120 West 55th Street.

66.    Lewis invited Nobiletti to accompany him to Quality Bistro. Over drinks, Lewis discussed a potential full-time job for Nobiletti as Assistant Events Manager. Lewis told Nobiletti, in sum and substance, that he was a perfect fit for the role.

67.    At the end of their conversation, Lewis made a comment referencing Nobiletti's sexuality, then leaned over and placed his hand on the inside of Nobiletti's thigh, close to his penis.

68.    Nobiletti pushed Lewis's hand away and asked what Lewis was trying to do to him.  Lewis rolled his eyes, paid for his drinks, and left.  Lewis was so intoxicated that a bartender at Quality Bistro suggested that Nobiletti help Lewis get a cab, and Nobiletti did so.

69.    Following the incident, Lewis distanced himself from Nobiletti.  Nobiletti followed up several times about the Assistant Events Manager position, but was not given the role. Even though the position was never filled, Nobiletti believes that his refusal to give in to Lewis's sexual advances was a factor in his not getting the job.

<u>Management Ignores and Threatens Plaintiff & Others Who Complain About Sexual Harassment</u>

70.    Despite the open and notorious sexual harassment at Polo Bar since its opening, the restaurant has taken virtually no action in response to the misconduct.

71.    Several employees have reported instances of Dodson's harassment to management and/or Human Resources.  For example, Lopez complained about Dodson touching his penis and T.C. complained about Dodson's frequent unwanted touching.  Certain managers have witnessed some of Dodson's misconduct, including his touching servers without their consent.  On at least one occasion, Sweeney, the General Manager, stated jokingly that the servers

should mind how their ties were tied because of how "particular" Dodson was about it. Still, the restaurant did not meaningfully discipline Dodson despite knowledge of his inappropriate behavior. In fact, the restaurant promoted him multiple times after employees reported the harassment.

72.    Before Nobiletti complained to Human Resources about the sexual harassment, he spoke with Courtney Smith ("Smith"), then Dodson's assistant and a server at the restaurant, who discouraged Nobiletti making a "formal complaint."

73.    Smith, the assistant to Dodson as International Director, responded to plaintiff's sexual harassment complaints by trying to dissuade him from raising his concerns using threats and intimidation.  On or about October 1, 2023, Nobiletti and Smith discussed the sexual harassment that Nobiletti regularly faced and plaintiff's plans for making a complaint to Human Resources.  During this discussion, Smith said, in sum and substance, that if Nobiletti were to make a "formal complaint" against any Polo Bar employee, the Polo Bar would fire him.  She stated that defendants would hide their retaliation by claiming that they fired Nobiletti for drinking alcohol at work, including his drinking with managers.  Smith further explained that Nobiletti will have no credibility due to his drinking.    Nobiletti found Smith's comments deeply troubling.

74.    In the fall 2023, Nobiletti, both directly and through counsel, raised multiple complaints to Human Resources, senior management, and counsel for the restaurant about the sexual assaults and harassment that he experienced at the Polo Bar and Smith's threats of retaliation.

75.    For example, following Wooden's conduct on September 8, 2023, Nobiletti attempted to meet with Lewis, a manager, about the sexual harassment.  Lewis, however, avoided Nobiletti.

76.     On or about October 4, 2023, Nobiletti submitted a written complaint to Patti Langlais ("Langlais"), Vice President of Human Resources for Apicii.  In his email to Langlais, Nobiletti described the years long sexual harassment campaign that Wooden forced plaintiff to endure.  Nobiletti also detailed the September 8th incident when Diaz stated in front of several other employees, "Hey Frank, tell us all what happened at the bathhouse." Nobiletti stated that he believed that the sexual harassment he experienced violated the anti-discrimination laws.

77.     Thereafter, in or around early October 2023, Nobiletti had at least two discussions with Langlais about Wooden's sexual harassment.  They also exchanged multiple emails.  During a call with Langlais, instead of asking Nobiletti questions about the horrendous harassment he had faced, Langlais attacked Nobiletti's credibility; for example, she asked several times whether he had told restaurant employees other than Dodson and Lewis about his sexuality even though Nobiletti was clear that he had not.  Langlais also interrogated Nobiletti about his supposedly threatening to harm Wooden.  As was plainly obvious, Wooden had fabricated this concern following Nobiletti's protected complaints.

78.     In addition, by letter dated November 3, 2023, Nobiletti, through counsel, complained about sexual harassment and quid pro quo harassment that Defendants forced Nobiletti to endure.  In addition to raising concerns about Wooden, plaintiff complained about Lewis's and Dodson's sexual assaults.  Nobiletti explained that those were "merely examples of the many harassing and unlawful incidents" that he suffered during his employment.

79.     Despite these reports, Dodson did not face any meaningful consequences for his egregious misconduct until almost a year later in or around August 2024, when his employment with Polo Bar ended.

80.     In addition, Lewis remained at Polo Bar for approximately two years after assaulting Nobiletti.  Even though plaintiff complained, on November 3, 2023, about Lewis sexually assaulting him, Lewis continued working for the restaurant for several months.  In or around February 2024, on information and belief, defendants fired Lewis for reasons unrelated to his sexual assault of plaintiff.

81.     Smith also continues to work for defendants.  On information and belief, despite her retaliatory threats, which Nobiletti complained about to Human Resources, defendants took no action against Smith.

82.     As for Wooden, while he no longer works for defendants, he left the Polo Bar with minimal consequences. For example, upon information and belief, defendants allowed Wooden to leave voluntarily and provided him a severance package.  After a lengthy sabbatical during which he traveled and lived off his severance payment, he quickly obtained other employment.  Due to defendants' inaction, Wooden could well conclude that he is now free to sexually harass employees in his new workplace.

83.     Upon information and belief, after his departure, Wooden has disparaged Nobiletti within the industry, including telling others that he had to leave the Polo Bar because Nobiletti was having a crisis related to his sexuality.  This statement is untrue, helped Wooden cover up his own misconduct, and harmed Nobiletti's reputation in the restaurant industry.

Defendants Fire Plaintiff Because He Complains About Sexual Harassment

84.     After Nobiletti complained about sexual harassment and retained counsel, defendants not only failed to fix the problems, but also punished plaintiff.

85.     On February 8, 2024, Langlais, VP of Human Resources, told Nobiletti not to report to work at the usual time and instead to come to the Polo Bar for a meeting the following day.

86.     On February 9, 2024, as directed, Nobiletti went to the Restaurant to meet with Langlais.  At the meeting, defendants fired Nobiletti.

87.     During the February 9 meeting, Langlais claimed that defendants fired Nobiletti because he had consumed alcohol, which was then charged to the party in the Private Dining Room, during dinner service on or about February 6 or 7, 2024.

88.     As discussed above, many Polo Bar employees regularly drank alcohol while serving customers.  They did so with management's knowledge and, approval, and sometimes did so  together with managers. Further, drinking alcohol paid for by PDR patrons was a commonly accepted practice that managers at Polo Bar knew of and participated in. On information and belief, Nobiletti is the first, or one of the few, Polo Bar employee to face any discipline for such behavior.

89.     Moreover, defendants were aware that plaintiff sometimes had alcoholic drinks during work hours long before February 2024.  Indeed, Nobiletti sometimes consumed alcohol with his managers during his shifts.  For example, Nobiletti sometimes brought in bottles of his personal liquor that he shared with managers and other staff members during service. On multiple occasions, managers encouraged Nobiletti to bring in expensive bottles of liquor to share. In the summer 2023, before Nobiletti's protected complaints, General Manager Sweeney acknowledged to Nobiletti that he was aware that plaintiff consumed alcohol and said his job was safe because nobody was trying to fire him.

90.     Defendants regularly chose not to fire employees who engaged in far more egregious misconduct, including, as set forth above, Dodson, Fitzgerald, and Lopez.  For example, since 2015, Lopez regularly drank alcohol and snorted cocaine at Polo Bar, and he fraudulently altered customers' tips if he felt the tip was inadequate.  Upon information and belief, Lopez was

never disciplined for any of these actions until 2023. In late 2023, Lopez was issued a "final warning" (that also served as his first warning) to stop increasing customers' tips without their knowledge or permission. Upon information and belief, he was never disciplined for drinking or cocaine use at work.

91.     It was not until Nobiletti complained about sexual assaults and harassment that defendants took action against plaintiff purportedly for his drinking alcohol. As Smith, Dodson's assistant, had warned Nobiletti if he complained about the hostile work environment, defendants have tried to cover up their retaliation by claiming that they fired Nobiletti for drinking alcohol at work. Plainly, defendants fired Nobiletti because he dared to stand up to the toxic culture at the restaurant.

92.     On information and belief, after plaintiff made protected complaints about sexual assaults and harassment, Polo Bar leadership instructed Molly Nuland, a manager, to monitor Nobiletti and report on his behavior.

93.     On information and belief, on the same day Nobiletti was fired, Dodson instructed Lopez not to drink in the restaurant because representatives from Apicii were on the premises reviewing footage from the restaurant's cameras. Dodson did not provide such notice to Nobiletti.

Defendants Continue to Retaliate Against Plaintiff

94.     On September 23, 2024, the Polo Bar, through its attorneys, sent a cease-and-desist letter to plaintiff's attorneys. The letter contained a litany of accusations, including claiming that Nobiletti was causing another former Polo Bar employee to send threatening and harassing text messages to current employees and that Nobiletti was standing on the street outside the restaurant.

95.     Each of defendants' accusations was either false or so grossly exaggerated and was clearly intended to intimidate Nobiletti, discourage him from pursuing litigation, and create an impression that plaintiff, rather than the restaurant, was behaving unlawfully.

## FIRST CAUSE OF ACTION
Discrimination Under Title VII of the Civil Rights Act of 1964

96.     Plaintiff repeats and realleges paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     By the acts and practices described above, defendants subjected plaintiff to unlawful sex discrimination and sexual harassment, including a hostile work environment, in violation of Title VII.

98.     Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

99.     As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

## SECOND CAUSE OF ACTION
Retaliation Under Title VII of the Civil Rights Act of 1964

100.    Plaintiff repeats and realleges paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.    By the acts and practices described above, defendants subjected plaintiff to unlawful retaliation in violation of Title VII.

102.    Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

103.    As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

<u>THIRD CAUSE OF ACTION</u>
Discrimination Under the Executive Law

104.    Plaintiff repeats and realleges paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105.    By the acts and practices described above, defendants subjected plaintiff to unlawful sex discrimination and sexual harassment, including a hostile work environment, in violation of the Executive Law.

106.    Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under State Law.

107.    As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

<u>FOURTH CAUSE OF ACTION</u>
Retaliation Under the Executive Law

108.    Plaintiff repeats and realleges paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.    By the acts and practices described above, defendants subjected plaintiff to unlawful retaliation in violation of the Executive Law.

110.    Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under State Law.

111.    As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

<u>FIFTH CAUSE OF ACTION</u>
Discrimination Under the City Law

112.    Plaintiff repeats and realleges paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.    By the acts and practices described above, defendants subjected plaintiff to unlawful sex discrimination and sexual harassment, including a hostile work environment, in violation of the City Law.

114.    Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under City law.

115.    As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

<u>SIXTH CAUSE OF ACTION</u>
Retaliation Under the City Law

116.    Plaintiff repeats and realleges paragraphs 1 through 115 of this Complaint as if fully set forth herein.

117.    By the acts and practices described above, defendants subjected plaintiff to unlawful retaliation in violation of the City Law.

118.    Defendants acted with malice and/or reckless disregard to plaintiff's rights protected under City law.

119.    As a result of defendants' unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a) Declaring that the acts and practices complained of herein violate Title VII, the NYSHRL, and the NYCHRL;

b) Enjoining and permanently restraining these violations of Title VII, the NYSHRL, and the NYCHRL;

c) Directing defendants to place plaintiff in the position he would have occupied but for defendants' discriminatory and retaliatory treatment, and making him whole for all the earnings and benefits he would have received but for defendants' discriminatory treatment, including, but not limited to, wages and other lost benefits;

d) Directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

e) Directing defendants to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's rights;

f) Awarding plaintiff reasonable attorneys' fees and costs;

g) Awarding plaintiff such interest as is allowed by law;

h) Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

i) Granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.


Dated: New York, New York
      July 22, 2025

                                   VLADECK, RASKIN, & CLARK, P.C.

By:

                                   Jeremiah Iadevaia
                                   James Bagley
                                   Attorneys for Plaintiff
                                   111 Broadway, Suite 1505
                                   New York, New York 10006
                                   (212) 403-7300